Karen G. Bentley
AZ Bar No. 034148
**NEELEY LAW FIRM, PLC**
1120 S. Dobson Rd., Ste. 230
Chandler, AZ 85286
Phone: (480) 802-4647
Fax : (480) 907-1648
karen@neeleylaw.com
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
## PHOENIX DIVISION

| | |
|---|---|
| Patricia L. Butler,<br><br>                    Plaintiff,<br><br>         v.<br><br>TransUnion, LLC; National Credit Systems, Inc.; and DOES 1 through 100 inclusive,<br><br>                    Defendants. | CASE NO.<br><br>PLAINTIFF'S COMPLAINT FOR DAMAGES:<br><br>1.  Violation of Fair Credit Reporting Act |

COMES NOW Plaintiff **PATRICIA L. BUTLER** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

### **INTRODUCTION**

1.     This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt.

2.     Defendant National Credit Systems, Inc. ("NCS") is not reporting Plaintiff's account accurately as discharged in bankruptcy.

3.     The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

4.     A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

5.     The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

6.     In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

7.     Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetrate this bankruptcy myth, creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

8.    Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

9.    This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

10.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

11.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

12.    This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

13.    Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each named Defendant conducts sufficient business within the forum state and this Court has personal jurisdiction over Defendants under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

14.    Plaintiff alleges that she lived in the Woodland Apartments ("Woodland") until approximately January 2017 at which time she moved out.

15.    Plaintiff alleges that she never heard from or received any bill or invoice from Woodland.

16.    Plaintiff alleges that, upon information and belief, Woodland sold, transferred, or assigned its account to NCS.

17.    Plaintiff alleges that the NCS account was included in her Chapter 7 bankruptcy filing in that the debt occurred pre-petition and was subsequently discharged.

18.    Plaintiff alleges, that despite the fact the NCS account was discharged, it is reporting on Plaintiff's TransUnion credit report as an open and outstanding collections account, with an outstanding balance, and a past due amount; all of which is patently incorrect and misleading.

19.    NCS is not reporting the fact the debt was discharged anywhere on the tradeline on Plaintiff's TransUnion credit report. This is patently incorrect and misleading as it appears the debt was not discharged.

20.    Plaintiff alleges that it is patently incorrect and misleading for a debt which was discharged to be reported on a credit report as an open collections account, with an outstanding balance, or past due amount as this reflects the debt is still owed and collectible.

21.    Plaintiff alleges that each and every Defendant is familiar with the FCRA requirements and subscribes thereto.

22.    Plaintiff alleges that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

23.    Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous

meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair her Credit Score.

24.     In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

25.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     FICO, Inc.**

26.     FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

27.     The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions.[1]

28.     A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

29.     Base FICO Scores range from 300 to 850, while industry specific FICO

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. *See* https://www.myfico.com (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score").

Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

30.    Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

31.    There are twenty-eight (28) FICO Scores that are commonly used by lenders.

32.    A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

33.    The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

34.    FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

35.    There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

36.    Each of the five (5) factors is weighted differently by FICO.

37.    In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

38.    Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

39.    In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

40.    Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

41.    FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

42.    The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same level of severity with respect to their FICO Score and FICO uses the filing date, under both Chapters, to determine how long ago the bankruptcy took place.

43.    A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did

look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See id.*

44.     Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score".

**B.    e-OSCAR**

45.     e-OSCAR is the web-based system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

46.     When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

47.     The ACDV contains codes next to certain data fields associated with a credit file.

48.     When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

49.     When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

50.     For clarification, an AUD or other regular transmission is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

**C.     Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

51.     When a consumer files bankruptcy, certain credit reporting industry standards exist.

52.     Certain data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

53.     The Consumer Information Indicator ("CII") is a critical field that indicates a special condition that applies to a specific consumer.

54.     It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

55.     The CII "E" denotes that a Chapter 7 bankruptcy has been discharged.

56.     The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

57.     The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

58.    Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent in personam collection activity.

59.    Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

60.    The FCRA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was filed.

61.    A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

62.    The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

63.    Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

**D.    Plaintiff Filed Bankruptcy and Received a Discharge**

64.    Plaintiff filed a voluntary petition for Chapter 7 bankruptcy on December 30, 2020, in order to repair her creditworthiness and Credit Score.

65.    The Chapter 7 Trustee's Report of No Distribution was entered on June 22, 2021.

66.    Plaintiff's no asset bankruptcy was discharged on April 14, 2021.

67.     All of Plaintiff's unsecured debts, including any amount owed to the Woodland Apartment and/or NCS, were discharged on April 14, 2021.

**E.     Plaintiff's Credit Report Contains an Inaccurate and Adverse Tradeline, which Plaintiff Disputed to no Avail**

68.     On May 13, 2022, Plaintiff ordered a TransUnion credit report to ensure proper reporting by Plaintiff's creditors (the "May 13 Credit Report").

69.     Plaintiff noticed an adverse tradeline in her May 13 Credit Report, reporting inaccurate, misleading, or incomplete information that did not comply with FCRA standards.

70.     Plaintiff then disputed the inaccurate NCS tradeline via certified mail to TransUnion on or about June 8, 2022 (the "First Dispute Letter").

71.     Plaintiff's First Dispute Letter specifically put NCS on notice that she filed for Chapter 7 bankruptcy and received a discharge, and as such, her account should not be listed as an open account with a balance, and that Plaintiff's account should be updated.

72.     After checking a subsequent TransUnion report, the error was not corrected.

73.     Plaintiff then again disputed the inaccurate NCS tradeline via mail to TransUnion on or about July 21, 2022 (the "Second Dispute Letter").

74.     Plaintiff's Second Dispute Letter specifically put NCS on additional notice that the tradeline was inaccurate as she had incurred the debt to the Woodland in January of 2017, filed bankruptcy in December 2020, and received her discharged in April 2021. The Second Dispute Letter gave reference and contact information for Plaintiff's bankruptcy attorney and requested that the tradeline be removed as it was discharged.

75.     Plaintiff's First Dispute Letter and Second Dispute Letter will collectively be referred to as the "Dispute Letters".

76.     Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the account as required by the FCRA.

77.     Plaintiff is informed and believes that TransUnion received Plaintiff's Dispute Letters and, in response, sent Plaintiff's disputes to NCS, as the data furnisher, via an ACDV through e-OSCAR.

78.     On September 26, 2022, Plaintiff ordered a third TransUnion credit report to determine if her account was updated.

a.     **Inaccuracy – NCS**

79.     Despite actual knowledge, NCS reported Plaintiff's account, beginning in 46739XX, to TransUnion, as an open collections account, with an outstanding balance of "$1,384", and a past due amount of "$1,384", and updated as of "09/18/2022." This is patently incorrect as this account was discharged in bankruptcy on April 14, 2021.

80.     Plaintiff alleges that NCS failed to investigate whether Plaintiff filed for bankruptcy.

81.     NCS failed to update the tradeline on Plaintiff's TransUnion credit report to reflect that Plaintiff obtained a discharge in bankruptcy.

82.     NCS failed to update its tradeline on Plaintiff's TransUnion credit report to remove the open collections account, outstanding balance, or past due amount.

83.    TransUnion twice provided notice to NCS that Plaintiff was disputing the inaccurate and misleading information, but NCS twice failed to conduct a reasonable investigation of the information as required by the FCRA.

84.    Based on Plaintiff's disputes, NCS should have known that Plaintiff received a discharge in her bankruptcy proceedings.

85.    The most basic investigation would include a simple review of its reporting in light of the fact that Plaintiff filed a Chapter 7 bankruptcy and received her discharged in order to determine if the reporting complies with the maximum possible accuracy and completeness standard of the FCRA.

86.    Plaintiff alleges that NCS failed to review if its reporting complied with the unambiguous language of the FCRA or regulatory guidelines on accurate reporting under the FCRA.

87.    If NCS reviewed such standards, it would have seen that its reporting was not in compliance and was therefore patently incorrect or incomplete.

88.    NCS should have updated its tradeline to CII Code "E" to reflect the debt was discharged in Plaintiff's Chapter 7 bankruptcy, reported the account as closed, and removed the outstanding balance and past due amount.

89.    By reporting Plaintiff's account as described herein above, it appears to third parties viewing Plaintiff's credit report that the account was not discharged in bankruptcy, which is patently incorrect and misleading.

90.     The reporting is misleading as the outstanding balance, past due amount, and lack of any bankruptcy notation makes the account appear as if it is still outstanding, past due, and not discharged.

91.     Further, as this inaccurate reporting is being used to calculate Plaintiff's Credit Score, the Credit Score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

92.     The open collections account, outstanding balance, and past due amount reported by NCS is lowering Plaintiff's Credit Score, which adversely affects Plaintiff's ability to obtain credit.

93.     The lack of investigation and reporting of inaccurate and incomplete information by NCS is unreasonable.

**F.     Damages**

94.     Plaintiff pulled the credit report at issue at a cost for access to the report, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

95.     As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Bankruptcy Code, the Fair Credit Reporting Act, and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

96.    Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by NCS.

97.    Further, Plaintiff's diminished creditworthiness, resulting from NCS' inaccurate reporting, has caused her to abandon her intentions to apply for certain credit.

98.    On three separate occasions, Plaintiff was denied a new apartment lease due to the inaccurate reporting by NCS on Plaintiff's TransUnion credit report.

99.    Due to being denied an apartment near her new job, Plaintiff has incurred significant out of pocket expenses in commuting to work.

100.   NCS' actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

## FIRST CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))

### (Against Defendants and Does 1-100)

101.   Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    TransUnion Failed to Assure Credit Reporting Accuracy**

102.   TransUnion violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

103.    In a 2007 class action settlement, TransUnion agreed to modify its procedures regarding the reporting of all subsequent Chapter 7 bankruptcy discharges. *See Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 382 (C.D. Cal. 2007).

104.    As a part of the *Acosta* settlement, TransUnion agreed to update reporting on all "Bankruptcy Qualifying Tradelines" accounts. This includes automatically updating the reporting on such accounts to remove the charge-off or collection rating, deleting any current and/or past due balances, and adding Chapter 7 bankruptcy notation on the tradeline. *Id*.

105.    Further, TransUnion agreed to establish procedures that each will, of their own volition, update any Bankruptcy Qualifying Tradelines subject to a reinvestigation request, by removing the derogatory information and adding bankruptcy notation. *Id*.

106.    TransUnion failed to report the NCS account using the procedure it expressly agreed to adopt in *Acosta*.

107.    Had TransUnion maintained reasonable procedures to assure maximum accuracy, it would have never reported the NCS account as described herein.

108.    TransUnion knew, or should have known, (1) that the NCS account was discharged in bankruptcy, and (2) that the account should not have been reported with outstanding collection notations, an outstanding balance, or past due amount as the debt was discharged in bankruptcy. Further, TransUnion knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

109.    Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character,

and general reputation of consumers."[2] The investigation and evaluation of Plaintiff's credit worthiness, credit standing, credit capacity, character and general reputation as a consumer are all damaged by the reporting that TransUnion allowed.

110.   As a result of TransUnion's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit and other mental and emotional distress.

**B.    Willful Violations**

111.   TransUnion's violations, as described herein, were willful; specifically, TransUnion has intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

112.   TransUnion regularly, as a policy, ignores disputes by consumers and fails to perform even a basic investigation regarding the disputes. Additionally, TransUnion regularly fails to forward disputes to data furnishers, thereby frustrating the entire dispute process.

113.   To the extent TransUnion does send consumer disputes, it sends these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

---

[2] *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019).

114.    TransUnion's employees receive little to no training concerning how to accurately report consumer debt.

115.    Instead, TransUnion's employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

116.    TransUnion's employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

117.    TransUnion has intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

118.    As a result of TransUnion's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

119.    TransUnion's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

120.    In the alternative, TransUnion was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

121.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from TransUnion in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))

### (Against Defendants and Does 1-100)

122.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    NCS Failed to Reinvestigate Following Plaintiff's Disputes**

123.    Pursuant to 15 U.S.C. § 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

124.    After Plaintiff filed for Chapter 7 bankruptcy, NCS sent an AUD or monthly transmission to TransUnion reporting Plaintiff's account as an open collections account, with an outstanding balance, and a past due amount.

125.    After receiving Plaintiff's First Dispute Letter, NCS did not correct the inaccurate information, but instead verified and re-reported inaccurately via ACDV to TransUnion.

126.    After receiving Plaintiff's Second Dispute Letter, NCS did not correct the inaccurate information, but instead verified and re-reported inaccurately via ACDV to TransUnion.

127.    Therefore, on at least two separate occasions NCS violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable

investigation, and re-reporting misleading and inaccurate account information.

128.   TransUnion provided notice to NCS that Plaintiff was disputing the inaccurate and misleading information; however, NCS either failed to conduct any investigation or failed to conduct a reasonable investigation as required by the FCRA.

129.   Based on Plaintiff's disputes, the bankruptcy discharge, and review of its internal records on the account, NCS should have known its account was discharged in bankruptcy and ceased its inaccurate reporting.

130.   Reporting a discharged debt as an open collections account, with an outstanding balance, and past due amount is patently incorrect.

131.   In addition, this inaccurate reporting also adversely affects credit decisions. This inaccurately reported account is being considered when calculating Plaintiff's Credit Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported credit score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, NCS's reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and her ability to rebuild her Credit Score and obtain new credit.

132.   In the alternative, even if a credit reviewer did look at the tradeline, it would be misled as NCS' reporting makes the account appear to be currently an outstanding collection account and not discharged. NCS' reporting is patently incorrect and misleading.

133.   In fact, multiple apartments were misled by the reporting as Plaintiff received multiple rental denial letters due to the inaccurate reporting on Plaintiff's TransUnion credit report.

134.    As a result of NCS' violations of 15 U.S.C. § 1681s-2(b), Plaintiff has suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

**B.    Willful Violations**

135.    Plaintiff alleges that NCS has independently reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

136.    Plaintiff further alleges that NCS has not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, has developed reckless policies and procedures.

137.    Plaintiff alleges that rather than train its employees on accurate credit reporting, FCRA requirements, and industry standards, NCS' employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reporting.

138.    In the alternative, NCS was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

**E.    TransUnion Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

139.    Pursuant to 15 U.S.C. 1681i(a)(1), TransUnion was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's disputes regarding the NCS account.

140.    Thus, TransUnion failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the account within the statutory time frame.

141.    TransUnion is not a passive entity bound to report whatever information a data furnisher provides.

142.    Plaintiff alleges TransUnion is readily familiar with FCRA requirements and credit reporting industry standards.

143.    Based on the foregoing, Plaintiff alleges that TransUnion can, and does, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

144.    TransUnion can and does instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

145.    TransUnion failed to conduct a reasonable investigation because any basic investigation would have uncovered that it was not reporting the NCS account at issue correctly.

146.    Had TransUnion conducted a proper investigation, it could have updated the NCS account by adding a notation on the credit report to show that the debt was in fact discharged in bankruptcy and closed, and also removed the outstanding account balance, and past due amount. However, TransUnion continued to report the account as described herein.

147.    TransUnion, therefore, did not conduct even the most basic investigation regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

148. In the alternative, Plaintiff alleges that on one or more occasions, TransUnion did not send an ACDV to NCS to confirm accurate reporting on its account. Despite receiving Plaintiff's Dispute Letters providing notice of the inaccuracies, TransUnion did not delete or correct the tradeline or conduct an investigation.

149. In the alternative, if TransUnion deemed Plaintiff's Dispute Letters "frivolous or irrelevant" under 15 U.S.C. § 1681i(a)(3), TransUnion failed to notify Plaintiff of such determination as required by 15 U.S.C. § 1681i(a)(3)(B). As Plaintiff received no such notice from TransUnion, Plaintiff alleges TransUnion deemed her Dispute Letters valid, and thus triggered its obligations under 15 U.S.C. § 1681i(a)(1) and (2)(A), for which it did not comply.

## THIRD CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))

### (Against Defendants and Does 1-100)

150. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    TransUnion Failed to Review and Consider all Relevant Information**

151. TransUnion violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

152. Plaintiff alleges that TransUnion did not search or review any of her bankruptcy documents to confirm that she had filed a no asset chapter 7 bankruptcy and received her discharge.

153.    TransUnion's violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

154.    TransUnion's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

155.    In the alternative, TransUnion was negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

156.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from TransUnion in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**FOURTH CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))**

**(Against Defendants and Does 1-100)**

157.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    TransUnion Failed to Delete Disputed and Inaccurate Information**

158.    TransUnion violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

159.    TransUnion's violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

160.    TransUnion's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

161.    In the alternative, TransUnion was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

162.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from TransUnion in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**PRAYER FOR RELIEF**

163.    WHEREFORE, Plaintiff prays for judgment as follows:

a.    For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

b.    Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

c.    Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

d.    Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

e.    For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

f. For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**NEELEY LAW FIRM, PLC**

Dated: November 15, 2022

*/s/ Karen G. Bentley*
Karen G. Bentley
AZ Bar No. 034148
1120 S. Dobson Rd., Ste. 230
Chandler, AZ 85286
Phone: (480) 802-4647
Fax: (480) 907-1648
karen@neeleylaw.com

*/s/ Joshua B. Lane*
Joshua B. Lane
TX Bar No. 24092665
Schumacher Lane PLLC
P.O. Box 558
Spring Branch, TX 78070
Phone: (210) 541-2154
Fax: (210) 783-1383
josh@schumacherlane.com
*Admission pro hac vice forthcoming
Attorneys for Plaintiff

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial of this matter by jury.


                                        **NEELEY LAW FIRM, PLC**

Dated: November 15, 2022                */s/ Karen G. Bentley*
                                        Karen G. Bentley
                                        Attorneys for Plaintiff